548 F.2d 96
 9 ERC 1839, 7 Envtl. L. Rep. 20,127
 Harvey R. SHIFFLER, Jr., and National Federation of Federal
Employees, Local No. 476, a non-profit Corporation
of the State of New Jersey, Appellants,
v.
James R. SCHLESINGER, Jr., Secretary of Defense of the
United States, et al.
 No. 76-1876.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 19, 1976.
Decided Jan. 12, 1977.
 
 Michael D. Schottland, Thomas W. Cavanagh, Jr., Chamlin, Schottland, Rosen & Cavanagh, West Long Branch, N. J., for appellants.
 Jonathan L. Goldstein, U. S. Atty., John J. Barry, William E. Staehle, Asst. U. S. Attys., Newark, N. J., for appellees.
 OPINION OF THE COURT
 Before SEITZ, Chief Judge, and HUNTER and GARTH, Circuit Judges.
 SEITZ, Chief Judge.
 
 
 1
 This litigation involves a challenge to an agency determination that an Environmental Impact Statement need not be prepared (negative EIS) in conjunction with the realignment of a major military installation. Certain plaintiffs appeal from an interlocutory order on Count I of their complaint denying declaratory and injunctive relief which would prevent further transfer of certain military and civilian personnel from Fort Monmouth, New Jersey to Fort Gordon, Georgia until an EIS is prepared.
 
 I. FACTS
 
 2
 In April 1973, the Department of Defense (DOD) announced that a major component of the Army Signal School at Fort Monmouth would be consolidated with the Southeastern Signal School at Fort Gordon where new facilities were being constructed. The realignment decision was the culmination of 10 years of consideration within the Army. Prior to the realignment there were approximately 13,185 employees at Fort Monmouth with a monthly payroll of about $13 million. The Signal School employed about 2,485 persons and served 2,200 military students; the permanent employees' monthly payroll was $2 million.
 
 
 3
 At the time the realignment decision was reached, a negative EIS decision was made based upon the assumption that an anticipated shift of Electronics Command (ECOM) positions from Philadelphia together with an expected influx of employees resulting from consolidation of the Defense Language Institute (DLI) would offset the effect of the Signal School move and any adverse environmental effects that might otherwise have been anticipated. The DLI was not consolidated, however, and a significant number of the ECOM positions were never filled. Moreover, three successive reductions in force further reduced the number of jobs at the Fort. It was estimated that in June 1976, subsequent to the Signal School realignment, 10,165 positions would remain with a monthly payroll of about $12.5 million.
 
 
 4
 Plaintiffs filed suit in December 1975. Immediately thereafter, DOD voluntarily deferred further transfer of civilian personnel pending disposition of the case, although removal of equipment and military personnel continued. Nevertheless, in March 1976 only 957 Signal School employees remained at Fort Monmouth, and it was estimated that the move would be completed during 1976.
 
 
 5
 Plaintiff, Harvey R. Shiffler, Jr., is a civilian employee currently employed by ECOM at Fort Monmouth, but formerly employed by the Signal School there. Plaintiff, National Federation of Federal Employees, Local No. 476 (Union) is a designated bargaining agent for certain civilian employees of the Signal School. Plaintiff intervener, James J. Howard, is a member of the United States Congress representing the Third District of New Jersey which includes the communities adjacent to Fort Monmouth. Defendants are the Secretary of Defense, the DOD, and commanders of divisions of DOD responsible for the realignment decision.
 
 
 6
 Section 102(2)(C), 42 U.S.C. § 4332(2)(C) (1976) of the National Environmental Policy Act (NEPA), requires that along with every recommendation or report on proposals for "major Federal actions significantly affecting the quality of the human environment" (MASAQHE) a detailed statement of the environmental impact of the proposed action and alternatives which might minimize the impact must be submitted. Plaintiffs contend that the transfer of large numbers of civilian and military personnel from Fort Monmouth will precipitate high unemployment, decay and blight in the surrounding communities and that an EIS detailing these consequences should have been prepared. DOD concedes that realignment of the Signal School component of Fort Monmouth is a major federal action, but denies that it is one that significantly affects the quality of the human environment.
 
 
 7
 The district court, on cross motions for summary judgment, held, in an unreported opinion, that the proper standard of review of the threshold agency decision of whether or not an EIS is required for a particular proposed action is whether the decision was arbitrary and capricious, amounting to an abuse of discretion. The court found that the negative EIS decision in conjunction with the Signal School consolidation proposal was not an abuse of discretion. Moreover, assuming arguendo that it was, the court held that the injunctive relief sought was barred by the doctrine of laches.
 
 
 8
 Our analysis must begin with an examination of the propriety of judicial resolution of the dispute. Subject matter jurisdiction would appear to attach by virtue of the presence of a federal question and the requisite jurisdictional amount. Questions have been raised, however, concerning whether the negative EIS decision is, in this factual context, one which is committed to agency discretion by law and hence nonreviewable,[1] and plaintiffs' standing to bring this suit.
 
 II. REVIEWABILITY
 
 9
 In enacting NEPA, Congress recognized ". . . the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances (and further recognized) the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man . . . ." § 101(a), 42 U.S.C. § 4331(a) (1976). Congress declared it to be the continuing policy of the federal government to ". . . create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." § 101(a), 42 U.S.C. § 4331(a).
 
 
 10
 Toward this end, Congress imposed, in section 101(b), a substantive obligation upon all federal agencies to balance the environmental considerations and goals of the Congress along with the traditional factors of public interest particular to each agency's mandate. Thus, before undertaking any MASAQHE, the agency must determine whether its benefit is outweighed by negative environmental implications requiring modifications to, or abandonment of the proposed action. See, e. g., Calvert Cliffs' Coordinating Committee, Inc. v. A. E. C., 146 U.S.App.D.C. 33, 449 F.2d 1109, 1112-13 & n.5 (1971).
 
 
 11
 Congress structured this decisionmaking by establishing procedural requirements in § 102(2)(C). The agency is required to receive comments from other federal, state and local agencies possessing special expertise in the area impacted by the proposal, making them available to the President, the Council on Environmental Quality, and the public. It is also required to prepare an EIS, the basic decisionmaking document which reflects the environmental considerations which it is bound to consider under § 101, and which, together with the comments of those consulted outside of the agency, must "accompany the proposal through the existing agency review processes." § 102(2)(C).
 
 
 12
 Although there is some controversy concerning the reviewability of the substantive decision of whether a proposed MASAQHE is justified in light of the anticipated environmental harm, see Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army, 492 F.2d 1123, 1138-39 (5th Cir. 1974) (collecting cases), it is now clear that "NEPA does create a discrete procedural obligation on government agencies to give written consideration of environmental issues in connection with certain major federal actions and a right of action in adversely affected parties to enforce that obligation." Aberdeen & Rockfish R. R. v. SCRAP, 422 U.S. 289, 319, 95 S.Ct. 2336, 2355, 45 L.Ed.2d 191 (1975) (SCRAP II). We think that SCRAP II is dispositive of the reviewability of agency compliance with the procedural requirements of § 102.
 
 
 13
 Even if we did not regard SCRAP II as dispositive, we conclude that a negative EIS decision is clearly reviewable when § 102(2)(C) is considered under the standards announced in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) and Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). We agree with those courts which have said that Congress could hardly have provided a clearer or stronger mandate to the courts in § 102(2)(C). E. g., Calvert Cliffs' Coordinating Committee, Inc. v. A. E. C., 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971).
 
 
 14
 Nevertheless, DOD argues that the decision to consolidate military commands is committed to agency discretion by 10 U.S.C. § 125, and is thus nonreviewable, and that this decision cannot, in effect, be reviewed under NEPA. Section 125 provides inter alia:
 
 
 15
 (a) Subject to section 401 of title 50, the Secretary of Defense shall take appropriate action (including the transfer, reassignment, consolidation, or abolition of any function, power, or duty) to provide more effective, efficient, and economical administration and operation, and to eliminate duplication, in the Department of Defense. . . .
 
 
 16
 Relying upon United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (SCRAP I), DOD argues that NEPA was not intended to repeal by implication the positive grant of discretion to the Secretary of Defense over military command matters made by 10 U.S.C. § 125. In SCRAP I, the Court held that courts lack power to issue an injunction suspending railroad rate increases on the basis of the ICC's failure to comply with the procedural requirements of § 102. The Court found that 49 U.S.C. § 15(7) of the Interstate Commerce Act, which deliberately eliminated judicial power to suspend nonfinal rate increases, was not amended sub silentio by NEPA to permit suspension of rate increases by injunction for noncompliance with NEPA.
 
 
 17
 Accepting arguendo DOD's contention that the decision to consolidate military commands is committed to the discretion of the Secretary, we think that, carefully read, SCRAP I and SCRAP II provide no basis upon which to insulate the Secretary's decision from judicial review for compliance with the procedural requirements of NEPA. As a general matter, judicial review of agency decisionmaking for compliance with the procedural requirements of NEPA, does not sufficiently implicate the policies underlying nonreviewability of the substantive decision which triggers § 102(2)(C) to justify a finding that Congress intended to insulate the decisionmaking process from judicial review. In SCRAP I, the Court was faced with a specific congressional policy restricting the power of the federal courts to grant injunctions suspending interim rate increases. The policy underlying nonreviewability of the substantive decision in SCRAP I disruption of a nationally uniform rate increase of a temporary and emergency nature carries over with sufficient force to an injunction granted under NEPA to justify a belief that Congress did not intend to recreate in NEPA the judicial power it removed in § 15(7). Here, however, issuance of an injunction to afford an opportunity for compliance with § 102(2)(C) would not interfere with the Secretary's claimed discretionary decision to consolidate. At most it would interfere with the timing of the consolidation. Unlike 49 U.S.C. § 15(7), which specifically sought to prevent judicial interference with the timing of an emergency rate increase, a temporary postponement of the Secretary's decision in this situation is simply not critical to an effective exercise of the powers conferred upon him by 10 U.S.C. § 125.
 
 
 18
 In exercising its power under § 15(7), the ICC necessarily considers whether suspending a rate increase could spell the financial death of the carrier. In this context, issuance of an injunction would critically impair that exercise. The statutory suspension period is an interim procedure which carefully accommodates the various conflicting interests involved. 412 U.S. at 697, 93 S.Ct. 2405. A similar claim can hardly be made by the Secretary here when the planning of the realignment has extended over a decade.
 
 
 19
 Our analysis is supported, moreover, by the Court's disposition in SCRAP II of an argument similar to that made by DOD here. In challenging the power of the district court to review the decision of the ICC made in a general revenue proceeding for procedural compliance with NEPA, it was argued that since the decision of the ICC to permit a general revenue increase is nonreviewable, SCRAP I prevented judicial review of the decision for compliance with NEPA. The Court rejected this argument and reached the merits of the ICC's alleged noncompliance with § 102 of NEPA.
 
 III. STANDING
 
 20
 In order to obtain judicial review of agency action, plaintiffs must satisfy two requirements: (1) they must demonstrate the existence of a case or controversy within article III, that is, that they have suffered injury in fact, economic or otherwise as a result of agency action; and (2) they must be persons " . . . adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702 (1970), that is, the interests they seek to protect must be arguably within the zone of interests to be protected by the act. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 164, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).
 
 
 21
 The gravamen of Shiffler's complaint is that the realignment will result in large scale unemployment and population loss in the area surrounding Fort Monmouth which will produce "severe environmental and socioeconomic effects on plaintiffs' community and quality of life." (app. at 2). Plaintiff Shiffler, as a resident of the area, satisfies the injury in fact requirement because personally felt esthetic or conservational harm is sufficient to confer article III standing. United States v. SCRAP, 412 U.S. 669, 687, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (SCRAP I ); Sierra Club v. Morton, 405 U.S. 727, 734-35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).
 
 
 22
 The Union's interest is to promote the welfare of its members concerning employment matters. The dislocation, forced early retirement and grade reduction facing its members is economic injury to the members from which the Union may seek relief in a representative capacity. Although the claims it presses are environmental, the economic injury to its members qualifies as injury in fact. Sierra Club, supra, 405 U.S. at 737 & n.11, 92 S.Ct. 1361.
 
 
 23
 Since the original plaintiffs[2] satisfy the article III requirement of injury in fact, we are presented with a case or controversy which is appropriate for judicial resolution. DOD vigorously argues that plaintiffs are not arguably within the zone of interests sought to be protected by NEPA and, therefore, lack standing within 5 U.S.C. § 702. Because we dispose of this case on the ground of laches, see Part IV, infra, our judgment does not involve review of the agency action. We therefore find it unnecessary to determine whether plaintiffs satisfy the second element of standing.[3]
 
 IV. LACHES
 
 24
 Seeking to have us reverse the district court's decision to deny injunctive relief on the basis of laches, plaintiffs broadly assert that the doctrine of laches has no place in public interest litigation of this kind. We think the public interest claims which plaintiffs seek to vindicate, even if meritorious, may not necessarily outweigh the competing public interest in permitting the timely fruition of public programs irreversibly set in motion. As a general statement, we hold that the decision of whether or not to enjoin a MASAQHE pending compliance with NEPA is entrusted to the informed discretion of the district court. It must consider whether there has been inexcusable delay in instituting suit and prejudice to the public interest resulting therefrom while giving full weight to the important congressional policies embodied in NEPA. Although these criteria are similar to those which govern when litigants assert personal rights, see Churma v. United States Steel Corp., 514 F.2d 589, 592 (3d Cir. 1975), they take on different meaning in this context.[4]
 
 
 25
 A. Inexcusable Delay.
 
 
 26
 The equitable concept of estoppel inherent in the doctrine of laches, that one who has sat on his rights to the prejudice of defendant should not be afforded equitable relief, has little applicability in this context for two reasons. Because plaintiffs seek vindication of congressional policies aimed at benefitting the public generally rather than any particular individual, the public at large will suffer when meritorious environmental challenges are foreclosed. Moreover, the primary obligation for full compliance with NEPA rests with the agency, and the agency which has failed to heed the congressional mandate is in an awkward position to argue that tardiness should bar relief which in any event should have been unnecessary. See generally Minnesota Public Interest Research Group v. Butz, 498 F.2d 1314, 1324 (8th Cir. 1974) (in banc); Environmental Defense Fund v. Tennessee Valley Authority, 468 F.2d 1164, 1182-83 (6th Cir. 1972). Similarly, it is appropriate to consider the extent to which the delay in filing suit may have been attributable to the agency's failure to make available information which it is required to publicize.
 
 
 27
 B. Prejudice.
 
 
 28
 Unlike private interest litigation, when NEPA has been violated, considerations of administrative inconvenience, cost or delay which may be presented in answering a tardy suit are not appropriate considerations upon which to justify withholding equitable relief. The central consideration is whether interruption of the MASAQHE which is in progress would severely prejudice the public interest which the agency action is serving; however, "(d)elay and concomitant cost increases (in completing the project) would not alone justify noncompliance with the Act." Conservation Society of Southern Vermont, Inc. v. Brinegar, 508 F.2d 927, 937 (2d Cir. 1974) (Adams, J., sitting by designation), vacated and remanded on other grounds sub nom. Coleman v. Conservation Society of Southern Vermont, Inc., 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975) (mem.).
 
 
 29
 C. Environmental Policy Considerations.
 
 
 30
 NEPA specifically contemplates that the administrative decisionmaking process will be burdened by the procedural requirements of § 102(2)(C), and that the "product" which the agency delivers will be diminished somewhat in order to accommodate environmental goals. Therefore, as long as some environmental harm can still be ameliorated, compliance with NEPA will generally be ordered. When, however, the irreversible commitment of resources has already produced most of the environmental harm which an EIS would have anticipated, the costs-benefits matrix facing the decisionmaker is significantly altered, and the marginal utility (in environmental benefit) of enjoining the project may be substantially lessened. See generally Arlington Coalition of Transportation v. Volpe, 458 F.2d 1323, 1329-30 (4th Cir.), cert. denied, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972). This is more likely when the district court finds that although the agency has not fully complied with NEPA, it has identified and considered the major environmental hazards. In this situation the marginal environmental protection afforded by an injunction will be lessened to the extent that forcing full procedural compliance with NEPA is unlikely to alter the substantive decision so as to produce environmental benefits. Cf., Conservation Society of Southern Vermont, supra at 933-34 & n.26.
 
 
 31
 In the case sub judice, the district court found that suit was filed 21/2 years after the public announcement of the realignment "at a time when the relocation was between 85 to 90% completed." At that time, plaintiffs sought to enjoin relocation of the remaining 10 to 15% pending preparation of an EIS. The court calculated the cost to DOD of granting the injunction to be $6.5 million. Moreover, the court found the injunction would disrupt the training of military technicians for the Defense Satellite Communications System which, if uncompensated, would leave the program "seriously undermanned, affecting national defense." The court apparently considered whether an injunction would likely produce environmental benefits, for it found that DOD, in the course of its studies, "considered in great detail the impact of the realignment and has attempted to compensate for the economic and social effect of the Signal School movement."
 
 
 32
 We are satisfied that the court made the findings necessary to a correct evaluation and considered the appropriate criteria. The fact that environmental factors already had been considered carefully made it unlikely that forcing full procedural compliance after the project was nearly complete would affect the shape of the relocation program and produce environmental benefits. At the time of suit, there had been an irreversible commitment of secondary resources and an injunction would seriously disrupt the School's mission and potentially threaten national defense. It was not an abuse of discretion for the district court to withhold equitable relief after carefully weighing these factors.
 
 
 33
 Plaintiffs argue that DOD improperly withheld information which prevented a more timely evaluation and legal reaction to the announced realignment. However, they cite us to no record basis for their contention. Their argument that the remaining elements of the School are capable of autonomous existence conflicts with the court's finding that substantial disruption and cost would result from even a temporary freeze, a finding which plaintiffs have not assailed as clearly erroneous.
 
 
 34
 In view of our disposition of the case, we need not consider the alternative basis for the result reached in the district court's opinion.[5]
 
 
 35
 It is ordered that so much of the order of the district court denying the application of plaintiffs, Shiffler, National Federation of Federal Employees, Local No. 476 and Howard for injunctive relief and granting defendants' motion for summary judgment with respect to the above named plaintiffs is hereby affirmed. Each party is to bear his own costs on appeal.
 
 
 
 [1]
 Although chapter 7 of the Administrative Procedure Act provides for judicial review of agency action, 5 U.S.C. § 701(a)(2) excepts from review agency action committed to agency discretion by law. When a particular action is so committed the provisions of § 706 do not apply; rather, the action is unreviewable. Action on Safety and Health v. F. T. C., 162 U.S.App.D.C. 215, 498 F.2d 757, 760-61 (1974)
 
 
 [2]
 Plaintiff intervener, Congressman Howard, sought to assert the interests of his constituents who live in communities adjacent to Fort Monmouth and upon whom it is alleged the consolidation will have a severe environmental impact. Having determined that the original plaintiffs have article III standing, and in light of our disposition of the case, we need not consider whether Congressman Howard has standing
 
 
 [3]
 DOD argues that although the environmental effects of unemployment and population loss should be included in an EIS if one is prepared, they are at best secondary socioeconomic impacts which are insufficient by themselves to require an EIS. See 32 C.F.R. § 214.7(b)(2) (1975). It is argued that plaintiffs' interests are primarily economic ones not encompassed by the statutory term "human environment" and that the indirect environmental harm of which they complain is not arguably within the zone of interests which Congress sought to protect. See Breckinridge v. Rumsfeld, 537 F.2d 864 (6th Cir. 1976). But see McDowell v. Schlesinger, 404 F.Supp. 221 (W.D.Mo.1975)
 
 
 [4]
 The standard of appellate review which was carefully delineated in Churma is fully applicable in this context
 
 
 [5]
 The court held that the negative EIS decision in conjunction with the Signal School consolidation proposal was not an abuse of discretion. Since affirmance on the ground of laches does not implicate our standard of review, we do not find it necessary to discuss or to decide whether agency action in not filing an EIS is to be reviewed by an "arbitrary and capricious" standard, e.g., Nucleus of Chicago Homeowners Association v. Lynn, 524 F.2d 225, 229 (7th Cir. 1975), or by a broader standard of reasonableness, e.g., Minnesota Public Interest Research Group v. Butz, 498 F.2d 1314, 1319-20 (8th Cir. 1974) (in banc)