592 F.2d 164
 12 ERC 1625, 9 Envtl. L. Rep. 20,095
 CONCERNED CITIZENS OF BUSHKILL TOWNSHIP, by its Trustee ad
litem, Richard King, Bushkill Anglers Chapter, Trout
Unlimited, by its Trustee ad litem, Barry Fehnel, Linda
Kortz, Laurence Jarrett, Joseph Pail, Milton Kelchner,
William Morman and Frank Nikles,
v.
Douglas COSTLE, as Administrator, Environmental Protection
Agency, and Jack Schramm, Regional Administrator of Region
III, Environmental Protection Agency, Bushkill-Lower Lehigh
Joint Sewer Authority, Defendant-Intervenor.
PLAINFIELD TOWNSHIP TAXPAYERS ASSOCIATION, Sheridan King,
Michler Warner, Harold Coleman, and Joseph Dorner,
v.
Douglas COSTLE, as Administrator, Environmental Protection
Agency, and Jack Schramm, Regional Administrator of Region
III, Environmental Protection Agency, Bushkill-Lower Lehigh
Joint Sewer Authority, Defendant-Intervenor,
Bushkill-Lower Lehigh Joint Sewer Authority,
Defendant-Intervenor, Appellant.
 No. 78-1745.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 13, 1978.
Decided Jan. 9, 1979.
 
 Charles S. Smith, Easton, Pa., David Sive, Winer, Neuberger & Sive, New York City, for appellant.
 George J. Miller, Dechert Price & Rhoads, Philadelphia, Pa., for appellees Concerned Citizens of Bushkill Township, et al.
 Gary Neil Asteak, Easton, Pa., for appellees Plainfield Township Taxpayers Ass'n, et al.
 James W. Moorman, Asst. Atty. Gen., Washington, D. C., Robert N. DeLuca, U. S. Atty., and Robert S. Forster, Jr., Asst. U. S. Atty., Philadelphia, Pa., Jacques B. Gelin, and Robert L. Klarquist, Attys., U. S. Dept. of Justice, Washington, D. C., and R. Brent Alderfer, Dechert Price & Rhoads, Philadelphia, Pa., for Federal appellees; Gerald H. Yamada, Atty., Environmental Protection Agency, Washington, D. C., of counsel.
 Joseph M. Reibman, Reibman & Reibman, Easton, Pa., for Township of Bushkill, amicus curiae.
 Before GIBBONS, VAN DUSEN and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 VAN DUSEN, Circuit Judge.
 
 
 1
 This controversy depends on the power of a district court to grant a continuance of an evidentiary hearing on an application for preliminary injunctive relief,[1] where an administrative agency has requested time to reconsider its ruling challenged in the case, and on the propriety of using such a power in the situation presented by this record. The above appeal challenges a March 1, 1978, district court order denying a motion filed January 31, 1978, by Bushkill-Lower Lehigh Joint Sewer Authority, defendant-intervenor (hereinafter "Authority"), to restrain the EPA Administrator (Costle) and the Regional EPA Administrator for Pennsylvania (Schramm) "from (a) continuing to breach the grant agreement between the United States Environmental Protection Agency ('EPA') and the defendant-intervenor and refusing and/or failing to process said grant agreement in accordance with the usual customary practices and procedures, (b) refusing and/or failing to defend these consolidated actions in good faith, and (c) refusing and/or failing to take proper and necessary steps in furtherance of securing the earliest practicable trial date of" two consolidated actions brought by Concerned Citizens and Taxpayers, et al., against Costle and Schramm. We affirm the district court order insofar as it denied the above portion of the motion filed January 31, 1978.[2]
 
 I. BACKGROUND
 
 2
 On October 26, 1977, the Concerned Citizens of Bushkill Township, et al. ("Concerned Citizens") and Plainfield Township Taxpayers Association, et al. ("Taxpayers") filed separate complaints in the district court, alleging that the above EPA officials were responsible for the decision to grant federal funds in amounts exceeding nine million dollars to the Authority for construction of a sewer project in Northampton County, Pennsylvania, known as the Bushkill-Lower Lehigh Interceptor-Collector System ("Interceptor-Collector System"). The complaints described the project as a system of sewer interceptors and collectors extending from Easton, Pennsylvania, upstream along two creeks for approximately 30 miles. The plaintiffs alleged that the proposed project would have a significant environmental impact, principally by encouraging development of a currently rural area, and that EPA had violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 ff., by committing federal funds for the project and by doing so without first preparing an environmental impact statement ("EIS"). It also alleged that EPA's determination that the project would have no significant adverse environmental impact was arbitrary and capricious.[3] Further, it was alleged that EPA failed to study the environmental and economic impacts of the project for waste treatment funding, as required by the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. § 1281.
 
 
 3
 On October 28, 1977, the parties stipulated that plaintiffs' motions for a preliminary injunction would be heard simultaneously with the trial on the merits on November 21, 1977, which trial date was subsequently reset for January 3, 1978. Further, the parties stipulated that EPA and the Authority would not issue any further project approval or accept or award any contracts for sewer construction until after the trial and district court decision.[4] Following a December 23, 1977, conference with the district court concerning settlement and EPA's desire to restudy the project, the January 3, 1978, trial date was continued and the parties were directed to appear before the court on February 3, 1978.[5]
 
 
 4
 The district court opinion describes the situation before that court on February 3 and its decision to hear argument on the motion filed January 31, 1978, as follows:
 
 
 5
 "At the February 3, 1978 conference, EPA advised the Court that it had determined that its prior approval of the project without an environmental impact statement was or may have been based upon inaccurate and inadequate information, and that it had therefore decided to prepare an environmental impact statement, at least as to certain areas, to hold further project action in abeyance until such a statement could be prepared, with necessary public participation, fully considered, and ultimately filed in final form.
 
 
 6
 "At the same time, February 3, 1978, the Authority presented to the Court a complex motion, supported by some fifty pages of affidavits and brief, which it had earlier served upon other parties, and which it served upon the Court that very morning, and requested that the Court hold a hearing on the motion immediately. The Court declined to do so, and instead directed that the parties file briefs, and fixed oral argument thereon for February 28, 1978."
 
 
 7
 The parties had been actively engaged in discovery in the fall of 1977 and January 1978.
 
 
 8
 The district court concluded that the Authority's claims were basically for money damages against the United States for breach of contract or based on a United States statute and were barred by sovereign immunity, as well as the provision for recovery of such claims of over $10,000.00 against the United States in the Court of Claims (see 28 U.S.C. § 1491), using this language at 158a-159a:
 
 
 9
 "It is clear that the Authority's claims, both as stated in the proposed cross-claim, and by any independent analysis, ultimately constitute claims for money damages for breach of contract.
 
 
 10
 "This may be observed by noting what relief would satisfy the Authority: It is the disbursement of the project grant. Nothing less would alleviate the Authority's concerns. . . . Parenthetically, the Authority also requests that EPA be enjoined and mandamused to defend this action in good faith, but the sole basis for this claim is EPA's alleged contractual obligation, and the sole benefit to the Authority would again be the disbursement of the federal grant.
 
 
 11
 "Finally, this may be seen by the fact that neither EPA nor plaintiffs are doing anything to prevent the Authority from proceeding with the project. Given relief from its voluntary stipulation, there is no restraint whatsoever upon the Authority other than the matter of finances."
 
 
 12
 That court also held that there was no mandamus jurisdiction under 28 U.S.C. § 1361 because a discretionary, rather than a ministerial, duty was imposed on the original defendants and that an alternative remedy is available in the Court of Claims under 28 U.S.C. § 1491, citing Mattern v. Weinberger, 519 F.2d 150 (3d Cir. 1975); Grant v. Hogan, 505 F.2d 1220 (3d Cir. 1975); Carter v. Seamans, 411 F.2d 767 (5th Cir. 1969).[6]
 
 
 13
 On March 1, 1978, the district court denied the motion of Authority and also provided in that order:
 
 
 14
 "It Is Further Ordered that said intervening defendant is relieved from its undertakings and obligations under the Stipulation and Order entered on October 28, 1977, and as to all other parties said Stipulation and Order shall remain in full force and effect, pending further order of this Court."
 
 
 15
 On March 7, the court entered an order transferring the case to the Civil Suspense File "for statistical purposes" pending preparation of an EIS "as to certain areas within the project . . .," without prejudice to the rights of the parties. On April 27, 1978, the Authority filed its notice of appeal challenging only the March 1, 1978, order.
 
 II. JURISDICTION
 
 16
 The district court had jurisdiction to determine whether the defendants had made and were continuing to make an objective, good faith effort to comply with the requirements of Title 42, Chap. 55, of the United States Code, entitled National Environmental Policy Act. See National Helium Corp. II, supra at 1001-03, 1005-06 (Breitenstein, J., concurring). This court's jurisdiction is limited to reviewing that portion of the March 1, 1978, order refusing to grant an injunction. See 28 U.S.C. § 1292(a)(1) and Gardner, supra, and Larson, supra, cited in note 2 above.[7]
 
 
 17
 III. RECONSIDERATION OF THE PRIOR APPROVAL OF THE SEWER
 
 
 18
 PROJECT AND DETERMINATION OF EPA TO PREPARE AN EIS
 
 
 19
 As noted above at pages 6-7, EPA advised the court at a conference on February 3, 1978, that (1) its prior approval of the project without an EIS was or may have been based on inaccurate and inadequate information, and (2) it had decided (a) to prepare an EIS, at least as to certain areas, and (b) to hold further project action in abeyance until such a statement could be prepared, with necessary public participation and full consideration.
 
 
 20
 The congressional declaration of national environmental policy in NEPA provides:
 
 
 21
 "(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.
 
 
 22
 "(b) In order to carry out the policy set forth in this chapter, it is the Continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may
 
 
 23
 "(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
 
 
 24
 "(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;
 
 
 25
 "(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;
 
 
 26
 "(4) . . . maintain, wherever possible, an environment which supports diversity and variety of individual choice;
 
 
 27
 "(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and
 
 
 28
 "(6) enhance the quality of renewable resources . . . .
 
 
 29
 "(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment."
 
 
 30
 42 U.S.C. § 4331 (emphasis supplied).
 
 
 31
 The emphasis placed by Congress on the "continuing" obligation of Federal Government agencies to carry out the above policy and accomplish the environmental conditions prescribed in 42 U.S.C. § 4331(b), as quoted above, is further implemented by Executive Order No. 11,752, portions of which are quoted in the Appendix to this opinion, and by the requirements of 42 U.S.C. § 4332(C) that (1) "the policies, regulations and public laws of the United States shall be interpreted and administered in accordance with" the foregoing policies, and (2) all federal agencies shall "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement . . . on the environmental impact" of the proposal stating adverse effects which cannot be avoided, alternatives to the proposal, any irreversible and irretrievable commitment of resources, etc.[8]
 
 
 32
 It is clear that projects in the design or pre-construction stage are subject to NEPA. See Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir. 1972). In Shiffler v. Schlesinger, 548 F.2d 96, 104 (3d Cir. 1977), this court, in an opinion by Chief Judge Seitz, stated that only when an irreversible commitment of resources has already produced most of the environmental harm anticipated by an EIS does the reduced NEPA benefit allow the court to balance the marginal environmental protection that would result against completion of the project.[9]
 
 
 33
 In view of the above statutory and regulatory (see Appendix) language, the federal courts have emphasized the dangers of making "an irreversible and irretrievable commitment of resources" (see 42 U.S.C. § 4332(C)(v) quoted above) by undertaking construction without full consideration of the NEPA policies set forth above. See e. g., National Resources Defense Council v. Nuclear Regulatory Comm'n, 539 F.2d 824, 845 (2d Cir. 1976), and cases there cited; Stop H-3 Association v. Volpe, 353 F.Supp. 14, 15-16 (D.Haw.1972).
 
 
 34
 In Calvert Cliffs' Coord. Com. v. United States A. E. Com'n, 146 U.S.App.D.C. 33, 37-38, 449 F.2d 1109, 1113-14 (1971), the court said:
 
 
 35
 "In general, all agencies must use a 'systematic, interdisciplinary approach' to environmental planning and evaluation 'in decisionmaking which may have an impact on man's environment.' In order to include all possible environmental factors in the decisional equation, agencies must 'identify and develop methods and procedures * * * which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations.' 'Environmental amenities' will often be in conflict with 'economic and technical considerations.' To 'consider' the former 'along with' the latter must involve a balancing process. In some instances environmental costs may outweigh economic and technical benefits and in other instances they may not. But NEPA mandates a rather finely tuned and 'systematic' balancing analysis in each instance.
 
 
 36
 "To ensure that the balancing analysis is carried out and given full effect, Section 102(2)(C) requires that responsible officials of all agencies prepare a 'detailed statement' covering the impact of particular actions on the environment, the environmental costs which might be avoided, and alternative measures which might alter the cost-benefit equation. The apparent purpose of the 'detailed statement' is to aid in the agencies' own decision making process and to advise other interested agencies and the public of the environmental consequences of planned federal action. Beyond the 'detailed statement,' Section 102(2)(D) requires all agencies specifically to 'study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.' This requirement, like the 'detailed statement' requirement, seeks to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. . . .
 
 
 37
 ". . . Indeed, the requirement of environmental consideration 'to the fullest extent possible' sets a high standard for the agencies, a standard which must be rigorously enforced by the reviewing courts." (Footnotes omitted.)
 
 
 38
 In view of the foregoing statutory terms and judicial decisions, it is clear that there was no abuse of discretion[10] by the district court in granting several additional months to the EPA to reconsider its approval of this project and to prepare an EIS, since it had a rational basis for determining that the government official defendants were justified in requesting more time to reevaluate their positions.[11] The district court had the duty to consider the fact that there had been no irretrievable commitment of resources when it acted in this case.
 
 
 39
 The Authority states in its reply brief, at page 13:
 
 
 40
 "In the present case, to the contrary, the Authority is not seeking any payments at all as a result of its cross-claims. Rather it seeks only to enforce the nondiscretionary and statutory duty imposed upon EPA to comply with NEPA and the FWPCA."
 
 
 41
 However, NEPA requires that the EPA defendants continue to consider the project until there has been an irretrievable commitment of resources. The record[12] does not establish a duty on such defendants to give final approval to the Interceptor-Collector System prior to an evidentiary hearing on the request for an injunction, particularly where the Authority will have a remedy at law in the Court of Claims under 28 U.S.C. § 1491 for any damages it is able to prove it has sustained. Also, no precedent has been cited by the Authority to support the position that the EPA defendants must represent its position in this law suit in which it has intervened.[13]
 
 
 42
 IV. REFUSAL OF THE DISTRICT COURT TO TERMINATE THE
 
 CONTINUANCE ON MARCH 1, 1978
 
 43
 As stated above (note 5), the court granted the EPA defendants a continuance of the January 3, 1978, trial date on December 23, 1977, subject to reconsideration of the trial date at a February 3, 1978, conference. At that conference, Authority presented its lengthy motion seeking, Inter alia, a prompt trial or hearing on its request for an injunction. After argument on February 28, this motion was denied by a March 1, 1978 order, which left in full force and effect the stipulation maintaining the project in status quo "pending further order of this court." The district court has not refused to issue an injunction but has continued the hearing date at the request of the EPA defendants, with the approval of plaintiffs but contrary to the wishes of Authority.
 
 
 44
 In Sutherland Paper Co. v. Grant Paper Box Co., 183 F.2d 926, 931 (3d Cir. 1950), this court said:
 
 
 45
 "There is no question that as a general proposition, the grant or denial of continuances is a matter within the discretion of the trial court. There is also no question that an abuse of that discretion is subject to correction by an appellate court."
 
 
 46
 In Landis v. North American Co.,[14] 299 U.S. 248, 254-56, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936), the Court said:
 
 
 47
 "(T)he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance. (Citing cases.) True, the suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else. . . . Occasions may arise when it would be 'a scandal to the administration of justice' in the phrase of Jessel, M. R. (Amos v. Chadwick, L.R. 9 Ch.Div. 459, 462), if power to coordinate the business of the court efficiently and sensibly were lacking altogether.
 
 
 48
 "We must be on our guard against depriving the processes of justice of their suppleness of adaptation to varying conditions. Especially in cases of extraordinary public moment, the individual may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted. . . . (D)iscretion was abused if the stay was not kept within the bounds of moderation."
 
 
 49
 In this case, also, the district court had a basis for concluding that the public welfare, as defined by Congress and the Executive in the statutes and Executive Order referred to above, would be promoted by the continuance in order to permit the EPA defendants to redefine their position. Whether the district court would have extended the continuance for an immoderate period will never be known with certainty because the Authority deprived it of jurisdiction by filing the notice of appeal on April 27, 1978. Since the district court reviewed the date for an evidentiary hearing on October 28, November 21, December 23, February 3 and February 28, there is no reason to believe that it would not have continued to review the matter and insist that the EIS be filed within a reasonable time or, in the alternative, that an evidentiary hearing be held.
 
 
 50
 The record does not establish that the EPA defendants have been responsible for procrastination, dilatory tactics, neglect or bad faith. See Gaspar v. Kassm, 493 F.2d 964, 969 (3d Cir. 1974); Davis v. United Fruit Co., 402 F.2d 328, 330-31 (2d Cir.), Cert. denied, 393 U.S. 1085, 89 S.Ct. 869, 21 L.Ed.2d 777 (1969); Chung Wing Ping v. Kennedy, 111 U.S.App.D.C. 106, 294 F.2d 735, 737, Cert. denied, 368 U.S. 938, 82 S.Ct. 380, 7 L.Ed.2d 337 (1961).
 
 
 51
 We can well understand the frustration of the Authority, and we too find it unfortunate that, interested persons in the locality having tentatively decided several years ago that such a project was necessary and the Authority having been permitted to expend its valuable time, effort and money, EPA has now tentatively determined to change its 1977 position, undertake further studies, and prepare a limited EIS. However, we note that the federal courts have been reluctant to grant exceptions to the impact statement requirement. See Note, The Environmental Impact Statement Requirement in Agency Enforcement Adjudication, Parts I-B, II and IV, 91 Harv.L.Rev. 815, 825 ff. (including cases there cited), 831 ff. and 839 ff. (1978).
 
 
 52
 On the facts of this case, we can find no abuse of discretion in the district court's continuance of the evidentiary hearing on the request for an injunction.
 
 V. CONCLUSION
 
 53
 We affirm that portion of the March 1, 1978, district court order which denied the application for an injunction and was appealable under 28 U.S.C. § 1292(a) (1), in accordance with the foregoing opinion. In order that the district court may reconsider the present status of this litigation, particularly in light of the EIS which should now be available, we direct that the record be remanded to the district court forthwith.
 
 APPENDIX
 
 54
 Executive Order No. 11,752, dated 12/17/73 (38 F.R. 34793), contains, Inter alia, this wording:
 
 
 55
 "Section 1. Policy. It is the purpose of this order to assure that the Federal Government, in the design, construction, management, operation, and maintenance of its facilities, shall provide leadership in the nationwide effort to protect and enhance the quality of our air, water and land resources through compliance with applicable standards for the prevention, control, and abatement of environmental pollution in full cooperation with State and local governments. Compliance by Federal facilities with Federal, State, interstate, and local substantive standards and substantive limitations, to the same extent that any person is subject to such standards and limitations, will accomplish the objective of providing Federal leadership and cooperation in the prevention of environmental pollution. In light of the principle of Federal supremacy embodied in the Constitution, this order is not intended, nor should it be interpreted, to require Federal facilities to comply with State or local administrative procedures with respect to pollution abatement and control.
 
 
 56
 "Sec. 3. Responsibilities. (a) Heads of Federal agencies shall, with regard to all facilities under their jurisdiction in the United States:
 
 
 57
 "(1) Ensure that applicable standards specified in section 4 of this order are met on a Continuing basis.
 
 
 58
 "(2) Cooperate with the Administrator and State, interstate, and local agencies in the prevention, control, and abatement of environmental pollution . . . .
 
 
 59
 "(4) Consider the environmental impact in the initial stages of planning for each new facility or modification to an existing facility in accordance with the National Environmental Policy Act (this chapter).
 
 
 60
 "(5) Include with all budget requests for the design and construction of new facilities or for modification of existing facilities funds for such measures as may be necessary to meet applicable standards specified in section 4. Budget requests shall reflect the most efficient alternative for meeting applicable standards.
 
 
 61
 "(7) Ensure that any funds appropriated and apportioned for the prevention, control, and abatement of environmental pollution are not used for any other purpose unless permitted by law and unless specifically approved by the Office of Management and Budget.
 
 
 62
 "(d) The Administrator shall:
 
 
 63
 "(4) Mediate conflicts between Federal agencies and State, interstate, or local agencies in matters affecting the application of, or compliance with, applicable standards specified in section 4.
 
 
 64
 "Sec. 4. Standards. (a) Heads of Federal agencies shall ensure that all facilities under their jurisdiction are designed, constructed, managed, operated, and maintained so as to conform to the following requirements:
 
 
 65
 "(2) Federal, State, interstate, and local water quality standards and effluent limitations respecting the discharge or runoff of pollutants adopted in accordance with or effective under the provisions of the Federal Water Pollution Control Act, as amended (section 1251 et seq. of Title 33, Navigation and Navigable Waters).
 
 
 66
 "(4) Guidelines for solid waste recovery, collection, storage, separation, and disposal systems issued by the Administrator pursuant to the Solid Waste Disposal Act, as amended (section 6901 et seq. of this title).
 
 
 67
 "(b) In those cases in which there are no environmental pollution standards as specified in subsection (a) for a particular geographic area or class of Federal facilities, the Administrator, in consultation with appropriate Federal, State, interstate, and local agencies, may issue regulations, which shall be published in the Federal Register, establishing environmental pollution standards for the purpose of this order." (Emphasis supplied.)
 
 
 
 [1]
 Authority's counsel made clear at the February 28 argument (N.T. 24) that it wished a prompt hearing on its application for a preliminary injunction if such hearing could be secured prior to a hearing on final injunction
 
 
 [2]
 The district court order also denied that part of Authority's motion seeking (a) leave to file a supplemental answer with cross-claims, and (b) its prayer for an order specifically enforcing its grant agreement for the Bushkill-Lower Lehigh Interceptor-Collector System, described under Background below. Insofar as the order denied (a), it was not appealable, see Gardner v. Westinghouse Broadcasting Co., 437 U.S. 478, 98 S.Ct. 2451, 2453, 57 L.Ed.2d 364 (1978) and 559 F.2d 209, 211 (3d Cir. 1977), and the record does not justify the conclusion that the district court abused its discretion in denying specific enforcement of the grant agreement sought under (b). See Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 704, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); Shiffler v. Schlesinger, 548 F.2d 96, 103 (3d Cir. 1977); National Helium Corp. v. Morton, 486 F.2d 995, 1000 (10th Cir. 1973) (hereinafter National Helium Corporation II )
 
 
 [3]
 The complaint alleged that the "Negative Declaration" filed by EPA in 1977 containing the above determination was invalid and inadequate
 
 
 [4]
 In recording this stipulation, the court used the following language appearing at pp. 34-35 of the transcript of the hearing at which the stipulation was read into the record (47a-49a):
 "It is my understanding that the project will be maintained in status quo as it exists today pending a determination by the Court of the issues raised following hearing on the application for a preliminary injunction and following hearing on the merits. Otherwise stated, following hearing on the application for a permanent injunction."
 
 
 [5]
 The district court opinion contains this language (152a-153a):
 "On November 21, 1977, the parties appeared before the Court in conference, at which time EPA stated that it was not ready for trial, while the plaintiffs stated that they were. The Sewer Authority requested an early trial listing, representing that its bids would expire in early 1978, whereas EPA requested a deferral till February 1, 1978. The Court set January 3rd, 1978, as the date for trial.
 "On December 23, 1977, having requested a conference with the Court, EPA advised the Court that it had tentatively determined to change its position, based on its further review of the project documents. EPA asked that the Court continue the trial, and proposed an investigation of the documents already in hand, which would require about a month, and thereafter anticipated a further study, the duration and nature of which was at that time unknown.
 "The plaintiffs agreed to EPA's request. The Sewer Authority opposed it, again asserting that its outstanding bids, which had been extended, would expire, after which, the Authority asserted, it might not be able to proceed with the project.
 "Considering that the defendant EPA, whose conduct was at issue, had represented that it could not immediately defend its action, considering the complexity of the matter, and considering the possibility, as suggested by EPA, that it might ultimately concede major portions of the allegations of the complaint, the concession of which the plaintiffs indicated would or may vitiate the need for a present trial of their remaining claims, and perhaps avoid trial completely, the Court granted the motion for a continuance. However, in view of the Authority's representations, the Court directed that EPA further advise the Court of the status of the matter and accordingly set a conference on February 3, 1978, for that purpose."
 
 
 [6]
 The court concluded its bench opinion with this language (167a-168a):
 "In so stating, the Court is not unaware of the basis for the concerns of the Authority. We recognize that financing, the matter of grants, sources of funding, by bond or otherwise, substantially depends in this modern day of government upon grants, sometimes both Federal and State. And so we understand the deep concern and apparent frustrations of the Authority members, and their advisors, who are obviously in this case so well motivated. This Court is often, indeed usually, confronted with parties who have acted in good faith and have done what they strongly believe to be right, and the Court does not doubt that such is the case here.
 "However, as governmental officials themselves, the Authority members should understand that in our government, powers and duties are allocated, and no government official is authorized to exceed his jurisdiction. Congress, in its wisdom, waived the sovereign immunity of the United States on contract claims over $10,000 only insofar as the Court of Claims is concerned. This Court must respect that limitation."
 
 
 [7]
 Because the portion of the March 1 order refusing to grant an injunction is appealable, the Joint Motion to Dismiss Appeal will be denied. See also note 2 above
 In Stateside Machinery Corp. v. Alpern, 526 F.2d 480 (3d Cir. 1975), this court held that a denial of a motion to stay arbitration is not the equivalent of a denial of an injunction for purposes of § 1292(a)(1). The Supreme Court of the United States has characterized 28 U.S.C. § 1292(a)(1) as reflecting a need to permit litigants to effectively challenge interlocutory orders of serious, irreparable consequence. See Baltimore Contractors, Inc. v. Bodinger, 348 U.S. 176, 75 S.Ct. 249, 99 L.Ed. 233 (1955). This record does not justify such a conclusion. See note 12 below. There is no jurisdiction over the cross-claims contained in the January 31, 1978, motion of Authority under the collateral order doctrine of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), since such claims are not "separable from and collateral to" rights asserted in the action but their determination will decide the main issue in the litigation seeking injunctive relief.
 
 
 [8]
 42 U.S.C. § 4332(C) provides:
 "The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall
 "(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on
 "(i) the environmental impact of the proposed action,
 "(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 "(iii) alternatives to the proposed action,
 "(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 "(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."
 
 
 [9]
 Recently the Supreme Court of the United States has affirmed an injunction halting a virtually completed one hundred million dollar dam project because of congressional policy contained in the Endangered Species Act, 16 U.S.C. § 1531 ff. (1976), for the protection of an endangered species (the snail darter). See Tennessee Valley Authority v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 2284 & 2301, 57 L.Ed.2d 117 (1978)
 
 
 [10]
 This court has held that a district court decision of whether or not to enjoin a recommendation or report on "major federal actions significantly affecting the quality of the human environment" (42 U.S.C. § 4332(2)(C)) "is entrusted to the informed discretion of the district court." See Shiffler v. Schlesinger, supra at 103. The sufficiency of an EIS is reviewable as to its reasonableness in the light of the requirements of 42 U.S.C. § 4332(2)(A)-(H). See National Helium Corp. II at 1001-03 and 1005-06 (Breitenstein, J., concurring). However, a district court is entitled to grant continuances in order to permit cases to be tried at a time when the parties are ready for trial
 
 
 [11]
 The position of the EPA defendants was stated at N.T. 43 of the February 28, 1978, hearing as follows:
 "We want to get on with this project in the most environmentally sound manner, in the manner which will best serve the purposes of not only the Authority and the Authority are, of course, merely representatives of the people who will ultimately be served in the service area get on to the purposes that best serve those people in the service area by preserving the natural and human environment, by safeguarding public health, as is clearly required by statute."
 
 
 [12]
 The affidavit of Mr. Wolfe, Chairman of Authority, after stating at 98a that extensions of the bids for the Interceptor-Collector System expire on March 3, 1978, continues as follows:
 "I verily believe that further extensions cannot be secured. Unless there is a determination of the issues involved in these lawsuits, the bids will be lost. The further delays which must necessarily result from the process which EPA has indicated it wants to follow to re-examine the project . . . will Probably kill the project."
 (Emphasis supplied.)
 At 119a-21a, this affidavit states:
 "(W)hile formal notification was prepared by EPA to send to B-LLJSA, that notification was never sent because, on information and belief, someone at EPA had made a personal commitment to Mr. Sugarman to give him ten days' time within which to file suit before formal Part B approval was given to B-LLJSA.
 "Further delays of these lawsuits May kill the project . . . ."
 (Emphasis supplied.)
 The statements concerning the current sewage disposal system are based on hearsay of what various officials "have informed" the deponent (see, for example, par. 49 at 122a-23a). Cf. F.R.Civ.P. 56(e).
 
 
 [13]
 During his argument before the district court on February 28, 1978, counsel for Authority said (N.T. 15):
 "Now, first, it is important to recognize that we do not plead a claim for damages. We plead for equitable relief, specific performance, and part of the relief we seek is essentially an order directing EPA to defend the lawsuit. And it is bound to do that because of its contractual and other obligations."
 Again, at N.T. 24, counsel for Authority argued:
 ". . . EPA says, 'We want to restudy it, and we accept the need.' We, the Authority, do not accept that."
 The Authority, seeking to establish a duty to defend, relies on the statutory language that makes approval of the grant a contractual obligation of the United States. If the Government has breached an obligation, it is that contractual obligation, and the remedy is in the Court of Claims.
 
 
 [14]
 See also Ferguson v. Bucks County Farms, 280 F.2d 739, 742 (3d Cir. 1960). In 9 Wright & Miller, Federal Practice and Procedure (1971), § 2352, p. 141, the authors use this language:
 "Motions for a continuance of an action are addressed to the sound discretion of the district court. Though there are limits on that discretion, they are not exacting and ordinarily the appellate court will not interfere with the district court's exercise of its discretion."