TOWNSHIP OF PARSIPPANY–TROY
HILLS, Plaintiff,

v.

Douglas M. COSTLE, Administrator of
the United States Environmental Pro-
tection Agency, et al., Defendants.

Civ. A. No. 78–1174.

United States District Court,
D. New Jersey.

Nov. 27, 1979.

**316**

Bertram J. Latzer, Pendleton & Latzer, Mountain Lakes, N. J., for plaintiff Township of Parsippany–Troy Hills; John N. Malyska, Newark, N. J., of counsel.

Joseph J. Maraziti, Jr., Maraziti & Kalish, Morristown, N. J., for defendants Rockaway Valley Regional Sewerage Authority and the Town of Boonton.

Theodore E. B. Einhorn, Einhorn & Harris, Denville, N. J., for defendant Township of Denville.

Frederic J. Sirota and Donald M. Malehorn, Wiley, Malehorn & Sirota, Morristown, N. J., for defendants Township of Mine Hill and Township of Rockaway.

Nathaniel F. Bedford and Alfred J. Villoresi, Villoresi & Buzak, Boonton, N. J., for defendants Township of Boonton and Township of Randolph.

Carol Lynn Jones, Vogel, Chait & Roettger, Morristown, N. J., for defendant Borough of Rockaway.

Alex Lazorisak, Succasunna, N. J., for defendant Township of Roxbury.

Louis P. Caroselli, Corp. Counsel, Jersey City, N. J., for defendant City of Jersey City.

John H. Dorsey, Young, Dorsey & Fisher, Boonton, N. J., for Town of Dover.

Ambrose & Monica, Morristown, N. J., for defendant Borough of Victory Gardens.

Robert E. Yadlon, Dover, N. J., for defendant Borough of Wharton.

James M. Kenihan, Kenihan & Cohen, Succasunna, N. J., for defendant Township of Jefferson.

John J. Degnan, Atty. Gen. of the State of New Jersey by Lawrence E. Stanley, Deputy Atty. Gen., Trenton, N. J., for defendants State of New Jersey and Daniel J. O'Hern, Commissioner of the New Jersey Department of Environmental Protection.

Robert J. Del Tufo, U. S. Atty., by Valerie F. Mauceri, Asst. U. S. Atty., Newark, N. J., for defendants Douglas M. Costle, Administrator of the United States Environmental Protection Agency; Eckardt C. Beck, Regional Administrator of Region 2 of the United States Environmental Protection Agency; Clifford L. Alexander, Jr., Secretary of the United States Department of the Army; T. C. Hunter, Jr., District Engineer of the New York District of Department of the Army Corps of Engineers.

OPINION

STERN, District Judge.

The Township of Parsippany–Troy Hills (Par–Troy) brings this action to enjoin the construction and funding of a massive three–phased wastewater treatment project. This project is part of a plan initiated by the defendant Rockaway Valley

Regional Sewerage Authority (RVRSA) to increase water treatment services to a number of municipalities in the Rockaway Valley, and to improve the quality of the Rockaway River. Defendant Environmental Protection Agency (EPA) reviewed the proposed project and eventually awarded funds to be used in its design and construction. The EPA made separate decisions to fund phase 1 and phase 2 of the project. These decisions were not preceded by an environmental impact statement (EIS). Rather, the EPA issued Negative Declarations, accompanied by environmental impact appraisals, which declared that the EPA did not believe those phases of the project would significantly affect the environment. Par–Troy claims that the EPA's decision not to prepare an EIS with respect to phases 1 and 2 of the project was in violation of the National Environmental Protection Act, 42 U.S.C. §§ 4321 *et seq.*, as well as other federal and state laws.

Plaintiff filed this action on May 31, 1978, seeking a declaration that the action of the federal defendants in granting funds to the RVRSA was illegal, and sought to enjoin RVRSA from further proceeding with the design or construction of its wastewater treatment plant. On April 12, 1979, plaintiff moved for a preliminary injunction. This motion was adjourned for several months, and in the interim plaintiff applied for a temporary restraining order, which was denied. Plaintiff's motion for a preliminary injunction, or alternatively, for summary judgment, was heard on September 10, 1979, along with defendants' motions for summary judgment.

The Court holds that the awarding of funds by the EPA to the RVRSA and the EPA's decision not to prepare an EIS with respect to phases 1 and 2 of the RVRSA project was neither arbitrary and capricious nor unreasonable. Accordingly, plaintiff's motions are denied and summary judgment will be entered in favor of all defendants.

## I. Background

Parsippany–Troy Hills is located in Morris County, New Jersey. It covers over 25 square miles and its population exceeds 55,000. Fahy Aff. ¶ 3. Within its borders is the Boonton Reservoir, which divides the Rockaway River into the "Upper Rockaway" and "Lower Rockaway." The Rockaway Valley Regional Sewerage Authority currently operates a sewage treatment plant located just below the Boonton Reservoir, which treats sanitary wastes generated in the Upper Rockaway Basin. EAC Report at 1. These sanitary wastes treated at the plant come from the more densely populated communities of Boonton, Boonton Township, Victory Gardens, Dover, Wharton, Denville, Rockaway Borough, Rockaway Township, and a small section of Randolph Township. *Id.*

The history of the Rockaway River is a sad one. The terrain of the Rockaway Valley is poorly suited for septic tanks, and those that existed often overflowed, spilling raw sewage onto the streets and into the streams. As one resident of Par–Troy testified at a public hearing conducted by New Jersey's Department of Environmental Protection on April 25, 1977:

[B]ack in 1968, 1969 and 1970 . . . [i]t was deemed an open sewer. Governor Hughes, in fact, was invited to lunch on the banks of the Rockaway River. He visited the area and turned up his nose and went back to the State Capitol. . . .

[B]ack in those years of 1968 through 1970, I can testify with my hand up to God that there was human waste, in its rawest form, coming down that river. . . .

Attachment to Latzer Aff., dated April 2, 1979. Another Par–Troy resident avers that:

Lake Hiawatha was developed as a summer community in the early 1930's and was noted for its recreational facilities. . . . The Rockaway River and the lake were used for fishing, boating and swimming. . . . By the late 1960's the poor quality of the Rockaway River and the low stream flow had destroyed the river and lake for recreational purposes. . . .

Schimmel Aff., ¶¶ 3, 4.

So bad were the conditions along the Rockaway River that on April 27, 1967, the

New Jersey Department of Environmental Protection (DEP) issued an order requiring Jersey City, which was then responsible for operating the sewage treatment plant at Boonton Reservoir, to construct a new plant. In 1968, the State of New Jersey sought and obtained a court order prohibiting any further connection of residents to the sewerage system. This "building ban" continues to this day. Court approval is required before any additional hook–ups can be made.[1]

In 1971, the Rockaway Valley Regional Sewerage Authority was formed, Adm.Rec. C, in order to relieve Jersey City of its obligation to provide low cost sewerage treatment to municipalities in Rockaway Valley. RVRSA thereby assumed Jersey City's court–ordered obligation to construct a new treatment plant. RVRSA took immediate steps to plan the new facility. It hired an engineer, E. T. Killam, Associates, (Killam), and an environmental consultant, Environmental Assessment Council, Inc. (EAC), to make extensive studies of a number of alternatives. In addition, the EPA conducted its own studies in conjunction with the Morris County Planning Board and the Tri–State Regional Planning Commission. Adm.Rec. HH. Numerous hearings were held. Par–Troy was given prior notice of all such hearings and, for the most part, was represented at them.

Ultimately it was determined that the project would be three–phased. Phase 1 would involve the construction of a new, 13.7 mile interceptor which would allow hook–up by municipalities to be served by the plant. This phase is now largely complete. Phase 2 would involve the upgrading of the existing RVRSA plant from a capacity of 7 million gallons of water per day (mgd) to a capacity of 12 mgd. Phase 3 would involve the construction of a new treatment plant, also to be located at the base of the Boonton Reservoir, with a capacity of 21 mgd.

The EPA has issued Negative Declarations on phases 1 and 2 of the project, thereby indicating that in its view, those two phases of the project will have no substantial impact upon the environment, and that it does not believe that an Environmental Impact Statement (EIS) is necessary. The Negative Declaration on phase 1 was issued on April 23, 1976; that on phase 2 was issued on March 21, 1978. Both of these documents indicate that an EIS will be prepared on phase 3 of the project, the 21 mgd plant.

Phases 2 and 3 are currently under advanced water treatment (AWT) review. Under Program Requirements Memorandum 79–7 (PRM 79–7), issued by the EPA on March 9, 1979, all AWT projects which have not yet received construction funding must be reevaluated with respect to cost–effectiveness. If the EPA finds that such a project is not energy and/or cost efficient, the project may not be funded.

Plaintiff contends that the EPA has violated the provisions of the National Environmental Protection Act (NEPA), 42 U.S.C. §§ 4321 et seq., (1) by not filing an EIS with respect to phase 1, the interceptor, and phase 2, the 12 mgd plant, and (2) by not consulting other interested federal and state agencies before making its EIS decision. Plaintiff also alleges violations of certain provisions of the Federal Water Pollution Control Act (Clean Water Act), 33 U.S.C. §§ 1251 et seq.; the Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661 et seq.; the Endangered Species Act, 16 U.S.C. §§ 1531 et seq.; the Historic Sites Act, 16 U.S.C. §§ 461 et seq.; and the Rivers and Harbors Act of 1899, 33 U.S.C. § 403. Plaintiff is seeking a declaration that the EPA's action was illegal, and also seeks to enjoin all defendants from continuing work on this project.

## II. Preliminary Issues

Defendants argue that this Court should not reach the merits of this case. They

---

1. New Jersey Superior Court Judge Jacques Gascoyne hears applications once a month from parties seeking relief from this "building ban." Since January, 1977, the court has granted new hook–ups to 46 commercial buildings, 27 additional residential bathrooms, 402 New Residential units, and has permitted 88 units to "Tie-in to system due to improperly functioning septic systems." Aff. of Barbara Morgen.

contend that plaintiff's challenge to phases 1 and 2 of the project are barred by laches. With respect to phase 2, they assert the apparently inconsistent argument that the claim is not ripe for decision.

### A. Ripeness

Defendants argue that this case is not ripe for review because phases 2 and 3 of the project are presently being reevaluated by the EPA pursuant to its AWT review. The results of that review, they point out, could run the gamut from a total denial of funds to funding as now submitted. It is also possible that changes in the design will be necessary.

[1] It is true that if the EPA decides not to fund phases 2 and 3, this controversy will be moot. We must look, however, at the nature of this action and the law which is invoked. This is not an action under the Administrative Procedure Act in which we are limited to review of "final agency action." NEPA is, by its own terms, addressed to agency action which is non–final. The statute imposes an obligation to prepare an EIS "in every *recommendation* or report on *proposals* for legislation and other Federal actions...." 42 U.S.C. § 4332(C). The action which is reviewable here is not whether in fact phases 2 and 3 should be funded, but whether the decision not to prepare an EIS was in violation of NEPA. The EPA's action is final with respect to that decision.[2]

The Supreme Court's decision in *Aberdeen & Rockfish R. Co. v. SCRAP*, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975), supports this result. SCRAP brought suit claiming that the ICC's approval of railroad rate increases was unlawful because the prepared EIS was inadequate. The railroads argued that the ICC's action was not ripe for review because ICC procedures permitted further attack upon the rate increases. The Supreme Court held that the linchpin of judicial review is not the finality of

the rate increase, but the finality of the EIS decision:

> When the ICC terminated the general revenue proceeding, the one thing which it must certainly have finally decided was that it need give no further consideration to environmental factors in that proceeding ... Whatever issues would remain open at a § 13 proceeding, one which would not remain open–no matter who filed the complaint–is whether or not sufficient consideration had been given to environmental factors at the general revenue proceeding ... The interim nature of a general revenue proceeding may be relevant to the question of the extent of the consideration of environmental factors required, but its nature does not prevent review of the question, finally decided by the ICC, whether the environmental impact statement prepared for that proceeding is adequate ... *When agency or departmental consideration of environmental factors in connection with that "federal action" is complete, notions of finality and exhaustion do not stand in the way of judicial review of the adequacy of such consideration, even though other aspects of the rate increase are not ripe for review.*

*Id.,* at 318–19, 95 S.Ct. at 2355 (Emphasis supplied).

### B. Laches

Defendants argue that the doctrine of laches bars the challenge to phase 1 (the interceptor) and phase 2 (the 12 mgd plant).

#### 1. The Interceptor

EPA issued its Negative Declaration as to the interceptor on April 23, 1976, thereby stating unequivocally that it would not prepare an EIS on that phase of the project. This lawsuit was not commenced until May 31, 1978 and it was not until the filing of an amended complaint in October 1978–2½ years after the Negative Declaration–that plaintiff sought to challenge the interceptor

---

**2.** A different question, not presented here, goes to the ripeness of the EIS decision itself; *i. e.,* whether the time is ripe for the agency to determine whether an EIS should be prepared.

*See, e. g., Sierra Club v. Morton,* 514 F.2d 856, 880–1 (D.C.Cir.1975), *rev'd on other grounds,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

portion of the project. Moreover, it was not until April 12, 1979–3 years after the Negative Declaration–that plaintiff filed its motion for a preliminary injunction. As of May, 1979, construction of the interceptor was 80% complete. Savedoff Aff.

The doctrine of laches takes on a different meaning in environmental litigation. *Shiffler v. Schlesinger*, 548 F.2d 96, 103 (3rd Cir. 1977). In *Shiffler*, the Defense Department announced in April, 1973, that it would consolidate the Army Signal School at Fort Monmouth with the Southeastern School at Fort Gordon where new facilities were being constructed. At the same time, it announced that no EIS would be prepared. The project was 85–90% complete in December 1975 when plaintiffs challenged the EIS decision. The district court denied injunctive relief on the ground of laches. The Third Circuit affirmed, saying:

> Unlike private interest litigation, when NEPA has been violated, considerations of administrative inconvenience, cost or delay which may be presented in answering a tardy suit are not appropriate considerations upon which to justify withholding equitable relief. *The central consideration is whether interruption of the [project] which is in progress would severely prejudice the public interest which the agency action is serving*; however, "[d]elay and concomitant cost increase [in completing the project] would not alone justify non–compliance with the Act."
> . . .
> NEPA specifically contemplates that the administrative decisionmaking process will be burdened with the procedural requirements . . . Therefore, as long as some environmental harm can still be ameliorated, compliance with NEPA will generally be ordered. *When, however, the irreversible commitment of resources has already produced most of the environmental harm which an EIS would have anticipated*, the costs–benefits matrix facing the decisionmaker is significantly altered, and *the marginal utility . . . of enjoining the project may be substantially lessened. . . .* This is more likely when the district court finds that

although the agency has not fully complied with NEPA, it has identified and considered the major environmental hazards. In this situation, the marginal environmental protection afforded by an injunction will be lessened to the extent that forcing full compliance with NEPA is unlikely to alter the substantive decision so as to produce environmental benefits.

*Id.*, at 103–4 (Emphasis supplied.)

Under *Shiffler*, the court in environmental litigation must focus not on plaintiff's delay in instituting suit but on the public interest. The public interest is not served by an injunction where an agency has "irreversibly committed its resources" to an ongoing project which is largely complete, particularly when the agency has already considered the environmental impact of the project.

■ In this case, the interceptor is 80% complete. The EPA has already committed $8 million to the project; RVRSA has committed another $7 million. The existing interceptor constitutes a health hazard to the residents of Rockaway Valley. The EPA and RVRSA have considered the environmental effects of the project in numerous reports and hearings. Under these circumstances, the Court finds that the interceptor portion of the project can no longer be challenged. This would be so even if plaintiff's delay were excusable; under *Shiffler* a plaintiff's motives are irrelevant.

### 2. The 12 mgd Plant

■ A different question is presented as to the 12 mgd plant. The Negative Declaration on this portion of the project was not issued until March 21, 1978. EPA has not yet committed any funds; in fact, this phase of the project is currently subject to AWT review. We hold that, under *Shiffler*, plaintiff's challenge to phase 2 is not barred by laches.

### III. NEPA and EPA Regulations Promulgated Thereunder

#### A. The Statutory Framework

The National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, is designed to

require all federal agencies to take environmental factors into account before embarking upon any "major federal action." Two of its requirements are applicable here. First, the Act requires "all agencies" of the Federal Government to:

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on–

(i) the environmental impact of the proposed action.

42 U.S.C. § 4332. Second, it requires such agencies to consult other federal agencies before it renders the EIS:

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. . . .

*Id.* Under NEPA, all federal agencies are charged with the responsibility of promulgating regulations governing when an EIS should be prepared.

EPA's guidelines with respect to wastewater treatment projects; set forth at 40 C.F.R. §§ 6.200 *et seq.* and 6.500 *et seq.*, provide that an EIS must be prepared when an EPA project will have a significant effect–beneficial or adverse–upon population, land use, fish and wildlife, floodplains, historic or archeological land sites, or endangered species. When the EPA determines under NEPA and its own regulations that the proposed project will not "significantly affect the quality of the human environment," it does not issue an EIS. Instead, it issues a Negative Declaration and an accompanying "environmental impact appraisal."

A Negative Declaration is a brief statement of the nature of a proposed project and its impact which is intended to inform the public that the EPA has decided not to prepare an EIS. An accompanying environmental impact appraisal describes in greater detail the nature of the project, the feasible alternatives, the environmental impact of the project, steps to minimize harm to the environment, comments and consultations on the project, and reasons for concluding that there will be no significant impact. 40 C.F.R. § 6.212.

## B. Scope of Judicial Review Under NEPA

The courts are divided on the standard for review of an agency's decision not to prepare an EIS. Some courts have opted for a reasonableness standard.[3] *City of Davis. v. Coleman*, 521 F.2d 661 (9th Cir. 1975); *Concerned Citizens of Waterford Township v. Berglund*, No. 77–222 (D.N.J.1978) (Gerry, J.). Others will reverse agency action only if it is arbitrary and capricious. *See Nucleus of Chicago Homeowners Ass'n v. Lynn*, 524 F.2d 225, 229–30 (7th Cir. 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); *Bosco v. Beck*, 475 F.Supp. 1029 (D.N.J.1979) (Fisher, J.). The Third Circuit has not ruled on the applicable standard of review. *See Concerned Citizens of Bushkill Township v. Costle*, 592 F.2d 164, 170 (3rd Cir. 1979); *NAACP v. Medical Center, Inc.*, 584 F.2d 619, 635 n.19 (3rd Cir. 1978); *Shiffler v. Schlesinger*, 548 F.2d 96 (3rd Cir. 1978).

■ This Court believes the arbitrary and capricious standard to be more appropriate for several reasons. First, the Environmental Protection Agency was intended to be a protector of the public's interest in preserving the environment. This is the same function served by the plaintiff in suits brought to enforce provisions of NEPA; there is no conflict of interest between the position of the agency and that of the plaintiff in this suit. Therefore, the agency's action should be given deference.

---

**3.** Even under the reasonableness test, the scope of our review is limited. We may determine only whether the EIS decision is reasonable based upon the administrative record before us. *City of Davis v. Coleman*, 521 F.2d 661, 673 (9th Cir. 1975). We may not determine whether the proposed action will, in fact, have no significant environmental effects, unless the administrative record is deficient. *See Hiram Clarke Civic Club, Inc. v. Lynn*, 476 F.2d 421, 425 (5th Cir. 1973).

Second, the EPA is an expert agency—that is, it possesses a special expertise with respect to projects such as the one at issue. The courts should defer to that expertise in most cases.

Finally, the effect of NEPA was to create administrative roadblocks to the construction of projects which may significantly affect the environment. The decision on whether to prepare an EIS requires a great deal of investigation into the environmental effect of a particular project, and even a Negative Declaration must be accompanied by an environmental impact appraisal which describes the nature of a project, alternatives considered, and the effects of a project. Congress decided that the cost of those roadblocks would be compensated for by the positive effects on the environment which would result from careful review of proposed actions. To subject the agency action to more stringent review would impose an additional roadblock to the construction of projects without the concomitant benefits to the environment. The agency is in a better position than the courts to determine if a project's effects will be significant enough to merit prolonged study. Thus, the EPA's action in deciding not to prepare an EIS must be upheld unless it is shown to have been arbitrary and capricious.

## IV. The NEPA Claims

### A. Failure to Prepare an EIS

■ NEPA requires that an EIS be prepared on all major federal actions which "significantly affect the quality of the human environment." The EPA in its 1978 Negative Declaration concluded that the 12 mgd plant would not have a significant effect upon the environment.[4] Par–Troy argues that the EPA's determination not to prepare an EIS with respect to the 12 mgd plant ignores the following "significant environmental effects": (1) the project will affect the quantity and quality of streamflow in the Lower Rockaway; (2) the project will induce population growth in the areas served by the project; (3) the location of the project will result in the infiltration of plant odors into surrounding areas; (4) the project is controversial, which is in itself a significant effect; and (5) the EPA's failure to guarantee against plant misfunctions is itself a significant environmental effect.[5] These alleged effects will be discussed in turn.[6]

### 1. Quantity and Quality of Streamflow in the Lower Rockaway

Plaintiff claims that the proposed increase of the existing 7 mgd plant to 12

4. The same finding was made with respect to the interceptor in the EPA's 1976 Negative Declaration. Because we have held that the claim with respect to the 1976 Negative Declaration is barred by laches, we will consider only the plaintiff's claims with respect to the 1978 Negative Declaration.

5. Par–Troy also argues that EPA did not have the right to segment the project for purposes of determining the environmental impact of each phase; that is, that EPA could not issue an EIS on phase 3 alone, without having first done so on phases 1 and 2. It is clear, however, that phases of a project which are not "interdependent" may be segmented for purposes of environmental review. See, e. g., Sierra Club v. Callway, 499 F.2d 982, 990–91 (5th Cir. 1974). The phases of the project here, while part of a massive plan to clean up the Rockaway River, are in fact separate and each will operate independently of the other. See also Borough of Fairfield v. Coleman, 8 ERC 1518, 1520 (D.N.J. 1975).

6. RVRSA contends that where an agency has fully explored environmental impacts of a proposed project, although not in an EIS, it should be deemed to have complied with NEPA, pointing to Mid–Shiawassee County Citizens v. Train, 408 F.Supp. 650 (E.D.Mich.1976), aff'd without opinion, 559 F.2d 1220 (6th Cir. 1977). We are unable, however, to find any support there for RVRSA's argument. In Mid–Shiawassee County Citizens, the court characterized the Negative Declaration and accompanying environmental impact appraisal as a "mini–EIS" which "reflect[s] a systematic, interdisciplinary approach to insure that, in deciding not to require an impact statement, no significant environmental factor is overlooked." The court found that the EPA had properly issued a Negative Declaration in a wastewater treatment project because the project would have no "substantial environmental effect." It did not hold that an agency is excused from preparing an EIS where the environmental impact is in fact significant.

mgd on its present site below the Boonton Reservoir will adversely affect the quantity and quality of streamflow in the Lower Rockaway. Streamflow in the Lower Rockaway is composed of (1) effluent from the *existing* RVRSA plant in the amount of 7.6 mgd, (2) "let–down" from the Jersey City Reservoir in the amount of 7 mgd,[7] (3) spill–over from the reservoir when it over-flows, and (4) rain run–off. Thus, the minimum streamflow in the Lower Rockaway is 14.6 mgd. Expansion of the existing plant to 12 mgd will increase the streamflow.

Par–Troy nonetheless argues that the new plant will fix the streamflow at too low a figure. Par–Troy reasons that the 7 mgd let–down from the reservoir is the result of a court order which it fears may some day be vacated.[8] Thus, all Par–Troy can count on in the future is the 12 mgd generated from the plant. This, they claim, is environmentally insufficient. According to Par–Troy, greater streamflow is necessary to (1) support acquatic biota, (2) preserve the aesthetics of the river, and (3) dilute "nonpoint pollution".[9] In other words, Par–Troy does not argue that the 12 mgd plant will reduce the current stream-flow in the Lower Rockaway; it argues that it will not increase it enough and will thus "lock" Par–Troy into a permanent streamflow of only 12 mgd.[10] We may consider only whether defendants' conclusion, that this environmental effect was not "significant" within the meaning of NEPA and that the agency was not required to prepare an EIS, was arbitrary or capricious.

The Administrative Record demonstrates that streamflow was considered in the planning of the 12 mgd plant. Although the EAC initially concluded in its 1973 Report, Adm.Rec. H, that streamflow should be fixed at a minimum of 16.7 mgd, it ultimately concluded that 12 mgd was an acceptable minimum:

> If the flow in the lower Rockaway is maintained at some level less than the existing 14 mgd, we feel that terrestial woody plants will begin to encroach upon the stream bed since portions of the bed will be exposed for long periods. If this encroachment occurs, this vegetation will greatly impede the flow of floodwaters thus causing or aggravating flooding conditions along the lower river.
>
> It should be noted that the response of the stream and its biota varies gradually and continually with changes in flow. This is illustrated by the difference in stream configuration between 17 and 12 mgd. While the difference is significant, it is not great.
>
> Therefore, while 17 mgd is our recommended minimum flow, somewhat lower flows are acceptable though not as desirable. We feel that any flow less than 12 mgd is unacceptable from an environmental standpoint.

1974 EAC Report, Adm.Rec. N at 183. EAC went on to note that the whole problem would be alleviated if RVRSA endeavored to require Jersey City to continue the 7 mgd let–down until construction of the new 21 mgd plant. *Id.* at 184.

In its environmental impact appraisal, EPA concluded of the 12 mgd plant's effect on streamflow that:

> The water quality of the Lower Rockaway River will be improved by the proposed plant's release of large quantities of high quality effluent. The quality of water being released will allow the river's flow to be maintained near the desired level of ... 17 mgd. The minimum ac-

---

7. The New Jersey Superior Court ordered Jersey City to discharge 7 mgd from its reservoir into the Lower Rockaway in order to dilute the polluted effluent from the existing RVRSA plant. Fahy Aff. ¶¶ 29–30.

8. Par–Troy's fear has some merit. The state courts may decide that the let–down is no longer environmentally necessary once the existing plant is expanded to 12 mgd. *See* 1974 EAC Report at 172, Adm.Rec. N.

9. "Nonpoint" pollution is simply pollution which comes from sources other than the plant. The greater the streamflow, the greater the river's ability to dilute "nonpoint", as well as other, pollution.

10. Of course, Par–Troy will only be "locked" into 12 mgd until the new 21 mgd plant is completed.

ceptable flow is ... 14.6 mgd. The up-grading will produce a significant de-crease in the pollution load ... The improved quality is especially significant because the downstream serves as a water supply.

Adm.Rec. SS at 5. The EPA is not relieved of its obligation to prepare an EIS solely because the overall effect of a project will be beneficial. 40 C.F.R. § 6.200(a)(1). However, the regulations provide that "preference should be given to preparing EIS's on proposed actions which, on bal-ance, have adverse effects." *Id.* In view of this language, the EPA's decision not to prepare an EIS was not arbitrary or capri-cious. This is true even though plaintiff challenges the quantity of the treated ef-fluent as it relates to streamflow require-ments. *See* 40 C.F.R. § 6.510. Considering that the ultimate streamflow was to in-crease and that any detrimental effect on the streamflow was speculative, because it would have required the separate action of a state court, defendants' decision was not unwarranted.

### 2. *Effect on Upstream Population Growth*

Par–Troy also argues that an EIS should have been prepared because the 12 mgd plant will have a significant effect on popu-lation growth in the area. *See* 40 C.F.R. § 6.510(a). The court–ordered building ban has thus far curtailed population growth in Par–Troy. Par–Troy fears that expansion of the existing plant to 12 mgd will cause the ban to be lifted and will thereby induce population growth.

EPA, in the environmental impact ap-praisal which accompanied its Negative Declaration on the 12 mgd plant, acknowl-edged that the plant, although designed to upgrade service to the existing population, might also induce some population growth:

When this module is constructed, some of the capacity will be used to replace exist-ing septic systems only in those areas where they are inadequate to dispose of wastes properly. The remaining capacity will be available to serve a portion of the increased population expected by 1987

... [S]ome increase in population will occur when the building ban is lifted ...

Adm.Rec. SS at 6. The EPA was more specific about this anticipated population growth in a consultation report dated July 8, 1976:

[A][1] mgd facility in 1985 would provide only 1.7 mgd of capacity for new develop-ment in the areas to be served. Were all of this to be available for residential de-velopment, the system could accommo-date 17,000 more people or a 20% increase in population. In reality, new industrial and major institutional growth must also be accommodated. This growth is projected to account for as much as .7 mgd by 1985. Thus only 1 mgd would be available for residential use, providing service for 10,000 more people than resid-ed in the areas to be served in 1970. This would amount to a 12% increase in resi-dential population.

Adm.Rec. KK at 8–9. It was not unreason-able for the EPA to conclude that a 12% increase in population, spread out over a period of between five and seven years, is not significant, particularly when such an increase could only occur if the building ban is lifted.

### 3. *Other Alleged Environmental Effects*

Plaintiff also contends that the location of the 12 mgd plant in Par–Troy is in itself a significant environmental effect because plant odors will infiltrate surrounding areas and there are more environmentally suit-able locations for the plant. We find this contention to be without merit. Plaintiff further argues that the EPA's alleged fail-ure to guarantee against plant misfunctions is a significant environmental effect. This contention is also without merit. Plant misfunction is not a proper NEPA consider-ation nor is this subject ripe for judicial review. Concerns addressed to the design of the plant and its associated reliability characteristics are premature. Finally, plaintiff contends that because this project is highly controversial, an EIS should have been prepared. Except for the filing of this lawsuit, there is nothing in the record to indicate that this project is controversial.

## V. Failure to Consult Other Agencies

The EPA is required by NEPA, by its own regulations, and by other federal statutes to consult other federal agencies before deciding whether to prepare an EIS. Par–Troy contends that before the Negative Declarations were issued on the interceptor[11] and the 12 mgd plant, the EPA should have consulted the United States Fish and Wildlife Service, which is part of the Department of the Interior, and the Department of the Interior itself. It also contends that the EPA should have consulted the New Jersey Department of Fish, Game and Shell Fisheries.

### A. The United States Fish and Wildlife Service of the Department of the Interior

Consultation with the Fish and Wildlife Service is required not only by NEPA but by the Fish and Wildlife Coordination Act, 16 U.S.C. § 662(a), which provides that:

[W]henever the waters of any stream or other body of water are proposed or authorized to be ... controlled or modified ... by any department or agency of the United States ... such ... agency first shall consult with the United States Fish and Wildlife Service, Department of the Interior.

In addition, EPA regulations promulgated pursuant to NEPA require consultation with the Fish and Wildlife Service where "an EPA action will result in the control or structural modification of any stream or other body of water...." § 6.214(b)(5).

■ The EPA did not consult with the Fish and Wildlife Service before it rendered its 1976 and 1978 Negative Declaration, but it appears that it did subsequently consult that agency. The Fish and Wildlife Service has attempted to determine both the primary and secondary impact of the proposed projects and has not recommended that an EIS be prepared on phase 2 of the project. Kulp Aff., July 24, 1979. Thus, although the EPA did not literally comply with the above statute or regulation, it does not

seem proper—given that the Fish and Wildlife Service has been consulted and has concurred in the EPA's actions–to order a complete repetition of the original process at this time. It would be both unfair and counter to the intent of the statute to·impose purely formal, although time–consuming, obligations on the EPA when the substance of the statutory requirements has been fulfilled.

### B. The Department of the Interior

■ Plaintiff contends that the EPA should have consulted the Department of the Interior before deciding whether to prepare an EIS because: (1) the EPA action would affect a threatened or endangered species, see 16 U.S.C. § 1536, 40 C.F.R. § 6.214(b)(6); (2) the EPA action "may cause irreparable loss or destruction of significant historical or archeological date ...," see 16 U.S.C. § 469a–1, see also 16 C.F.R. § 6.214(a)(1); and (3) the EPA action may affect wetlands, see 40 C.F.R. § 6.214(b)(1).

1. Endangered Species. Plaintiff's contention that the project will affect endangered species, supported by a Par–Troy sponsored "Herpetological Survey" of the Rockaway River Floodplain between Montville and Parsippany–Troy Hills dated May 21, 1979, is not borne out by the evidence. The survey itself is deficient in several respects. For example, it is predicated upon the construction of the 21 mgd plant, for which an EIS will be prepared. See p. 1 of the survey. Further, the survey in particular sought out "bog turtles" and "blue–spotted salamanders," neither of which are on the list of endangered species under the Endangered Species Act, see 50 C.F.R. § 17.11, although they are apparently classified as endangered species under New Jersey law.

2. Historical and/or Archeological Data. Par–Troy contends that the interceptor may affect certain historical and archeological sites. There is nothing in the record to suggest that the 12 mgd plant will disturb any historic and/or archeological properties.

---

11. As noted previously, the challenge to the interceptor is barred by laches.

Therefore, because the claim is limited to the interceptor, it is barred by laches.[12]

3. Wetlands Areas. This claim also appears to be directed solely at the interceptor, portions of which apparently will be or have been constructed in wetlands areas. It is barred by laches.

### C. The New Jersey Department of Fish, Game and Shell Fisheries

■ EPA regulations require consultation with "the head of the agency administering the wildlife resources of the particular State" where EPA action will result in the control or structural modification of any stream or other body of water. 40 C.F.R. § 6.214(b)(5). Par–Troy argues that the 12 mgd plant's effect on stream flow in the Rockaway River required consultation with the New Jersey Department of Fish, Game and Shell Fisheries. It is not clear from the record whether this agency was consulted or whether this is even the agency which the EPA should have consulted. We find, however, that it is not in the interests of justice to delay proceeding with phase 2 until the New Jersey agency has been consulted.

### VI. Clean Water Act Claims

■ Plaintiff contends that defendant RVRSA violated provisions of the Clean Water Act, 33 U.S.C. § 1251 et seq., in that: (1) it failed to demonstrate that alternative waste management techniques have been studied; (2) it failed to study and evaluate existing alternative processes which provide for recycling, reuse or reclamation of water; (3) it failed to take into account and to allow, to the extent practicable, application of future technology which will allow for reclamation or recycling; (4) it failed to analyze potential recreation and open space

opportunities; (5) it failed to take nonpoint pollution into account; and (6) it failed to provide for the protection and propagation of fish and wildlife. We find all of these contentions to be without merit.[13]

### A. Failure to Demonstrate that Alternative Waste Management Techniques have been Studied

The Clean Water Act, 33 U.S.C. § 1281(g)(2)(A) requires a clean water grantee to study alternative methods for treating wastewater. Par–Troy argues that RVRSA failed to adequately review methods for (1) storing storm run–off,[14] and (2) reclaiming and recycling wastewater to augment streamflow in the Rockaway River. The statute, however, imposes no obligation to consider either of these two particular items. Moreover, the voluminous administrative record demonstrates that RVRSA and the EPA fully complied with this Clean Water Act requirement. See "Draft, Facilities Plan for the Rockaway Valley Regional Sewerage Authority, Wastewater Treatment Facilities," June 1977, VII–28 to VII–58, Adm.Rec. EE, which reveals that RVRSA's engineer, Killam, considered at length a number of alternative treatment processes.

### B. Failure to Take into Account and to Allow to the Extent Practicable Application of Future Technology which will Allow for Reclamation or Recycling

33 U.S.C. § 1281(g)(2)(B) provides that a Clean Water Act grantee must demonstrate that:

as appropriate, the works proposed for grant assistance will take into account and allow to the extent practicable the

---

**12.** The record reveals that EPA did consult with the Advisory Council on Historic Preservation. See Adm.Rec. CC, containing correspondence.

**13.** Because of our disposition of these claims we do not consider the EPA's contention that it is not bound by the Clean Water Act, certain provisions of which apply only to facilities planning begun after September 30, 1978.

**14.** Storm run–off storage would apparently store rainwater so that it need not be treated by the wastewater treatment plant. Par–Troy cites to a Senate Report indicating the importance of storing such run–off which, in some municipalities, may reduce the capacity of treatment facilities by as much as 50%.

application of technology at a later date which will provide for the reclaiming or recycling of water or otherwise eliminate the discharge of pollutants.

The Clean Water Act was intended to encourage the use of treated wastewater—through recycling or reclamation—rather than the mere discharge of the wastewater into another body of water. *See* 33 U.S.C. § 1281(b). Thus, a treatment plant which does not currently utilize recycling and/or reclamation should be designed to accommodate such a system in the future.

Par–Troy claims, pointing to the following statement in the 1976 Environmental Impact Appraisal, that neither RVRSA nor the EPA have complied with this statutory mandate:

> On the basis of the unresolved questions with regard to the induced impacts of the RVRSA project on water supply, quantity and quality on downstream flooding, and on socio–economic factors, EPA has decided to prepare an EIS on the RVRSA wastewater management project to determine:
>
> 1. the ultimate capacity of the wastewater treatment facility;
>
> \* \* \* \* \* \*
>
> In order to arrive at the ultimate capacity of the treatment facility, the EIS will consider the difference between the first phase minimum sizing of the plant (i.e. to accommodate the existing population plus growth projected only through 1985) and the proposed year 2020 sizing of . . . 21 mgd based on the joint study of *the area's carrying capacity*.

(Emphasis Par–Troy's.) Par–Troy contends that this statement suggests that EAC believed that the size of the proposed treatment facility would be limited solely by questions concerning the RVRSA's area's carrying capacity. Apparently, Par–Troy is arguing that, in taking size into account,

RVRSA was considering only its population needs, rather than the possibility of later accommodating a recycling/reclamation system. The record makes clear, however, that it is RVRSA's goal to utilize a water reuse system. The "Report upon the Proposed RVRSA Total Water Management Plan" (April 1975) devotes over a hundred pages to this possibility. Killam, in his covering letter to RVRSA, states that:

> An important aspect of the Rockaway Valley Sewerage Authority Total Water Management Plan is the ultimate reuse of highly treated wastewater . . . [B]ecause of the well known water shortage in the area, RVRSA has requested the evaluation of future reuse of highly treated effluent as a segment of the overall development plan . . .
>
> \* \* \* \* \* \*
>
> Our analysis indicates that the reuse of wastewater is not presently cost effective when compared to the development cost of remaining fresh water sources. Therefore, implementation now cannot be justified. However, it is our opinion that in the future wastewater reuse will be practical if either the Tourne Reservoir site or the Deer Pond Reservoir site can be implemented.

Adm.Rec. T at 2.

Thus, we find that RVRSA has complied with this provision of the Clean Water Act.[15]

### C. *Failure to Analyze Potential Recreation and Open Space Opportunities*

Par–Troy contends that RVRSA has not considered Par–Troy's recreational needs in the planning of this facility, as required by 33 U.S.C. § 1281(g)(6). Again, plaintiff's contention is simply not supported by the record. The Draft Facilities report, *supra*, prepared jointly by Killam and EAC, reveals that provision has been made for recreational and/or aesthetic uses:

---

15. *See also* Draft Facilities Plan, *supra* at p. VII–5:

[P]ublic opposition has resulted in the rejection of the water re–use plan by RVRSA, USEPA and the NJDEP. For this reason, the proposed wastewater treatment facilities will

not incorporate processes for the removal of phosphorous as originally anticipated. *Further expansion of the plan to incorporate additional processes can still be undertaken* . . .

Emphasis added.

On–site rest and recreation areas that highlight the ecology of the area are also relevant possibilities. Such an area exists in the lowland woodland comprising the eastern sector of the Rockaway Valley Regional Sewerage Authority site. In addition to the natural vegetation, there is a row of mature Norway Spruce present in that area, providing aesthetic locale for a rest area.

p. VI–34.

It is clear that RVRSA has complied with this provision of the Clean Water Act.

### D. Failure to Study and Evaluate Alternative Processes which Provide for Recycling, Reuse or Reclamation of Water

Par–Troy asserts that RVRSA has not studied alternative wastewater treatment processes and techniques which provide for the reclaiming and reuse of water, as required by 33 U.S.C. § 1281(g)(5).

The record again refutes plaintiff's claim. RVRSA considered at length a plan for the reuse of effluent discharged from the plant, which would have provided for the storage of treated effluent at a reservoir to be located either in Tourne Park or Deer Pond. The water would have served both as potable water supply for RVRSA area residents and as a source for flow augmentation. See RVRSA's Preliminary Design Report (September, 1973) (Adm.Rec. G) and Killam's 1975 Report (Adm.Rec. T). This plan was rejected because of public opposition but can still be implemented in the future. Draft Facilities Plan, supra, at Adm.Rec. EE, p. VII–5.

### E. Failure to take Nonpoint Pollution into Account

Plaintiff contends that the EPA ignored the effect of "nonpoint" pollution, that is, pollution which joins the water at a source other than the treatment plant. 33 U.S.C. § 1281(c) provides that:

To the extent practicable, waste treatment management shall be on an areawide basis and provide control or treatment of all point and nonpoint sources of pollution, including in place or accumulated pollution sources.

This language is hardly obligatory. Nonetheless, EAC in its May 15, 1975 Addendum, Adm.Rec. U, explored at length the problem of nonpoint pollution where storm water flows into the river, taking with it various land pollutants (e. g., chloride, nitrate, sulfate). The Addendum concludes:

[I]t is doubtful that the impact of the increased pollutant loads from the basin's stormwaters will have a significant effect upon the surface water quality of the basin.

The impact of these stormwater flows will be greatest where stormwaters are directly discharged into streams or lakes without pre–treatment. If these flows are pre–treated or allowed to run overland before being discharged to the receiving waters, runoff quality will be substantially improved.

We recommend that municipalities within the basin adopt regulations which stipulate the use of sedimentation and detention basins in connection with residential, commercial and industrial developments in order to attain a degree of treatment of these runoff waters.

Id. at 43. Plaintiff's contention thus finds no support in the record.

### F. Failure to Provide for the Protection and Propagation of Fish and Wildlife

Par–Troy asserts that defendants made no provision for the protection and propagation of fish and aquatic life or for recreational water uses. 33 U.S.C. § 1252(a). Once again, the record belies this claim. The Draft Report makes clear that protection of fish in the Rockaway River was to be a high priority:

Improved water quality in the Rockaway River subsequent to April 1972 is . . . indicated by the higher dissolved oxygen concentrations noted in a survey conducted in the summer and fall of that year by Killam. Field surveys by the EAC in 1973 indicated that, while larger–sized aquatic flora and fauna were not extremely prevalent, they were noted in

some areas.... A considerable population of mallards were seen resting and feeding in the Rockaway River ... Of interest is the fact that up to 35 individuals were present in the secondary clarifier of the treatment facilities with breeding occurring in the effluent ditch.

The entire length of the Rockaway River has a water quality classification of FW–2 ... FW–2 designates streams suitable for potable water ... agricultural water, primary contact recreation and protection of natural biota ... Any wastewater discharged into the Rockaway River must be of sufficiently high quality to prevent degradation of the river below its designated classification.

Adm.Rec. EE, p. VIII–17–18.

### VII. Plaintiff's Remaining Claims

#### A. Claim under the Rivers and Harbors Act

█ Par–Troy claims that section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, has been violated because the Army Corps of Engineers did not issue a so–called "§ 10 permit" before the interceptor was built. It is not clear whether the Rockaway River is "navigable" so as to come within the meaning of the Act. The Corps of Engineers concluded that it was not.[16] In any event, since the challenge to the interceptor is barred by laches, we need not resolve this issue.

#### B. State Law Claim

█ Par–Troy claims that the 12 mgd treatment plant is in violation of state law in that its design life is less than ten years. N.J.Admin.Code 7:9–1.49 provides that:

Treatment units shall be designed for population and sewage flow anticipated not less than ten years after completion of construction.

Par–Troy cites the following EPA statement in the environmental impact appraisal on the 12 mgd plant:

[T]he design of this minimally–sized, short–design life (7 years) treatment plant is being funded. The intent is to provide relief to existing residents with inadequate on–site disposal systems and lift the building ban.

Adm.Rec. SS at 3. This state law provision is inapplicable here. It was intended to ensure that long–term population growth be considered in the design of treatment plants. That is precisely what has been done here. The 12 mgd plant will be replaced with a much larger facility designed to serve a much larger population. Further, the 12 mgd plant is not being constructed from scratch; it is merely an expansion of an existing facility. Moreover, the New Jersey Department of Environmental Protection has authority to relax the rule. N.J.Admin.Code 7:9–1.2(b).

### CONCLUSION

█ We hold that all claims with respect to phase 1 of the project, the interceptor, are barred by laches. Further, we hold that the EPA's decision not to prepare an EIS with respect to phase 2 of the project was not arbitrary or capricious.[17] Nor do we find that the grant of funds by the EPA to the RVRSA violated the Clean Water Act, the River and Harbors Act, or state law. Accordingly, plaintiff's motion for a preliminary injunction is denied, and summary judgment will be entered for all defendants on all counts.

---

**16.** The Corps will, according to the government, issue an "after the fact" permit under 33 C.F.R. § 326.5.

**17.** We note that our decision would in all respects be the same were we to apply, as plaintiff urges, the reasonableness standard of review.